## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

DEBRA MULLOY,
a/k/a DEBRA DEPAUL,

     Defendant.

**Crim. No. 1:18-cr-10200-FDS**

## DEFENDANT'S SENTENCING MEMORANDUM

This case presents several anomalies.  The PSR recommends 26 points, an amount that converts to a GSR of 63-78 months.  The Government will recommend 63 months, a total that includes two-point enhancements for both a vulnerable victim and a substantial financial hardship. The total offense level of 26 also includes an enhancement for violation of a position of trust, a charge that stems from the same conduct against the same victims as the vulnerable victim enhancements.

As stated in the PSR, our client Debra Mulloy's ("**Mrs. Mulloy**") case also demands a mandatory two-year sentence for a charge of aggravated identity theft[1].  While we accept that Mrs. Mulloy's conduct amounted to a violation of the statute, it is clear that absent a May 20, 2017 memo from Attorney General Jeff Sessions about discretion in charging decisions, this count

---

[1] The named victim of the aggravated identity theft charge is David Wantuck ("**Wantuck**"), a former employee of Bierly-Drake.  The card Mrs. Mulloy used for her scheme was a corporate card issued to Wantuck by the company and used by Mrs. Mulloy for many legitimate corporate expenses in addition to her improper use.  The company, and Mrs. Mulloy, continued to use Mr. Wantuck's corporate card for legitimate purposes even after he left the company.

would not be present.[2]  The defendant is well-aware that the language of 18 U.S.C. §1028A(b)(3) mandates that federal judges "not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section."

Debra Mulloy comes before this Court because of her fraudulent conduct, which, as set forth below, defies logic.  Mrs. Mulloy misappropriated more than two and a half million dollars from her former employer.  Mrs. Mulloy's actions were not a well-planned attempt to enrich herself at the expense of her victims, but the impulsive behavior of an unhappy person with deep-seeded resentment toward her employers.

As set forth in more detail below, we believe the appropriate total offense level in this case should be between levels 17 and 21 absent the identity theft count.  The Defendant seeks a sentence between 24 and 37 months, an amount that is sufficient but not greater than necessary to reflect the significance of her actions yet still allow her, after a period of incarceration, to continue caring for her husband, providing childcare for her young nephew, maintaining her mental health, and returning to work so that she will be able to effect restitution.

**I.   <u>Background Facts and Applicable Guideline</u>**

On July 10, 2018, Mrs. Mulloy pled guilty to a three-count indictment of which counts one and two charged wire fraud and count three charged aggravated identity theft.

Mrs. Mulloy's scheme can be reduced to an unremarkable theft totaling slightly more than $2.5 million dollars in corporate funds, primarily enacted through the personal use of a corporate

---

[2] Sessions' letter establishes a "core principle that prosecutors should charge and pursue the most serious, readily provable offense," thus depriving United States Attorneys of any ability to eliminate certain charges as part of please agreements.

credit card and to a lesser degree through other means, such as the use of corporate funds to pay off certain charges on personal credit cards.

As the Court is aware, the Probation Department has calculated the Defendant's Total Offense Level at twenty-six (26).  As Mrs. Mulloy has never been involved with the law, her total criminal history score is zero (0), making her a Level I offender.  The calculation of 26 includes three (3) points Mrs. Mulloy has been credited for cooperation.

As argued below, the Defendant objects to the enhancements of two (2) points for alleged Vulnerable Victim and two (2) points for Substantial Financial Hardship and additionally offers the argument below as to why the (16) points related to the amount of loss overstates Mrs. Mulloy's culpability.  The charge of aggravated identity theft carries a two-year mandatory sentence.

## II.    A Sentence of 24-37 Months is Sufficient but not Greater than Necessary Under 18 U.S.C. §3553(a)

Standard practice dictates that after consulting the advisory sentencing guideline, federal judges undertake a case-specific analysis of the §3553(a)factors in order to fashion a sentence.  C*f. United States*, 128 S.Ct.586, 596 (2007).   "[A] sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons to deviate from them." *United States v. Prosperi*, 686 F.3d 32, 42 (1st Cir. 2012) (quoting, *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (affirming sentences of six months' home confinement and three years' probation despite a GSR of 87-108 months).

It is generally accepted that 18 U.S.C.§ 3553(a)(1) requires the Court to consider the nature and circumstances of the offense as well as the history and characteristics of the Defendant.  Sections 18 U.S.C. §3553(a)(2)(A-D) direct the Court to consider, the (A) seriousness of the crime, (B) deterrence, (C) prevention of further crimes from the defendants, and (D) provision of vocational, medical or other correctional treatment.

3

**A.** **The Offense Conduct – Nature and Circumstances of the Offense**

Not all $2.6 million-dollar frauds are created equal.  As set forth in the PSR, over approximately five years, Debra Mulloy misappropriated more than $2.6 million dollars, around five and one-half times the salary she earned during that same period.  For a different defendant, such a theft could have enabled a massive lifestyle enhancement, or the purchase of exotic cars and lavish vacations.  Instead, the lion's share of Mrs. Mulloy's habitual misappropriation of corporate funds facilitated the hording of millions of dollars' worth of clothing, jewelry and furs which were largely unused.  Instead, these items mostly wound up in crowded closets and garbage bags, and, with the exception of the sale of roughly $30,000 worth of clothing after she left her employment, resulted in no monetary gain to Mrs. Mulloy.  Many of the purchases were donated to the Boys & Girls Clubs of America.

Mrs. Mulloy's were not the calculated actions of someone who set out to acquire wealth through illegal means, but the impulsive, irrational, and self-destructive behavior of an unhappy person.

**i.** **Loss is an Inapt Proxy for Mrs. Mulloy's Culpability**

More than 60% of Mrs. Mulloy's total offense level (16 of 26) is derived from the economic loss associated with her behavior.  While the size of the loss is not in question, an increase in offense level of sixteen (16) solely based on financial loss leads to an unnecessarily punitive result because Mrs. Mulloy's was not a crime of cunning or intention and the size of the theft creates a misleading image of the level of criminal intent associated with her offenses.

Since the adoption of U.S.S.G §2B1.1 in 2001, courts and commentators have criticized the Guidelines' focus on financial loss in the case of economic crimes, particularly those cases over $1 million dollars.  Since 2003, Judges have increasingly crafted sentences below the

guidelines range in §2B1.1 cases to the point where nearly half of all such cases result in a sentence beneath the guidelines range.[3]  In 2014, the ABA Criminal Justice Section Task Force on the Reform of Federal Sentencing of Economic Crimes urged the Sentencing Commission to adopt a more thoughtful approach that fully considers the 3553(a) factors.

As part of its work, the Task Force created "Shadow Guidelines" that enable a more nuanced approach to the sentencing of economic crimes.  The Shadow Guidelines deemphasize loss and weigh the other § 3553(a) factors more explicitly in conjunction with it.  These Guidelines have been relied upon by judges in imposing sentences below the guidelines range in high dollar fraud cases.

Under this proposed system, Mrs. Mulloy's offense level would increase by only 8 as a function of loss rather than 16 (the total loss of $2.6 million would have fallen into a bracket ranging from $1 million in total loss to $5 million) and would have the potential to be lowered further based upon a broader analysis of the specific circumstances surrounding the loss such as culpability and harm to the victims.

In 2016, the Sentencing Commission adopted certain amendments to the guidelines, including §2B1.1, to address many of the issues that have been highlighted by the Task Force, defendants, and sitting judges.

Critics primarily take issue with the fact that the Guidelines do not correlate mental states with culpability or punishment in the way they do for crimes against the person.[4]

---

[3] *Sentencing and Guidelines Application Information for §2B1.1 Offenders*, United States Sentencing Commission - Symposium on Economic Crime 2013, Fig 4.
[4] *See e.g.*, *Frank Bowman, Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 171(2008) (noting that the Guidelines loss enhancements do not provide a way to distinguish between a defendant who consciously sets out to steal and cause hardship, and those who merely act dishonestly without such desire even though such a result goes against basic notions of fairness when it comes to crime and punishment).

a. If the loss related to Mrs. Mulloy's crimes is considered in the context of the factors in §3553(a), an enhancement of 16 based solely on loss is particularly punitive.

Mrs. Mulloy was employed by Bierly-Drake from 2004-2016.  Mrs. Mulloy did not abuse her **position or steal anything from her employers for almost eight years.**  Beginning in or about April 2012, after she had been elevated in a position which gave her access and control over corporate funds, and for a period of nearly five years thereafter, Mrs. Mulloy utilized corporate cards extensively for personal use and wrote occasional checks to cover family expenses amassed on personal credit cards.

Between April 2012 and December 2016, Mrs. Mulloy spent approximately two million dollars at two small boutiques.  Mrs. Mulloy visited the boutiques almost every day, even asking salespeople at the store to pick items they thought she would like if she was not present in the store.  In each case, Mrs. Mulloy used a Bierly-Drake credit card bearing the name "David Wantuck."  There is no indication Mrs. Mulloy made any representation that she was Mr. Wantuck or that she attempted to cover her tracks in any way.  While Mrs. Mulloy misappropriated a significant amount of money in this manner, the way it was taken suggests that Mrs. Mulloy's actions were not primarily, or even secondarily, an attempt to enrich herself.  Rather, they were but a function of impulse and a misguided response to perceived wrongs suffered at the hands of her employers.

Mrs. Mulloy's actions are notable because she placed herself at severe legal risk yet did so without any plan to make use of most of the fruits of her crime.  She acknowledges that she enjoyed the treatment she received as a loyal customer from the grateful proprietors of the boutiques where most of the money was spent, but in most cases, Mrs. Mulloy took the items she purchased and stored them in her home.  Over time, the items accumulated in her closet.  Eventually, Mrs. Mulloy

placed the items in contractor's bags, where most remained for many years.  For over four and a half years, while Mrs. Mulloy squirreled away millions of dollars' worth of expensive clothing and accessories, she and her husband continued to live the same lives they had before the theft began.

The mass of items in Mrs. Mulloy's home grew steadily over a period of approximately five years.  **Only in 2017, after Mrs. Mulloy left the company, did she begin selling some of the items**.  Without a job, Mrs. Mulloy sold some of the items for pennies on the dollar at consignment shops to meet her immediate financial needs.

### ii.      Mental Health

Due to the irrationality of Mrs. Mulloy's behavior and the bizarre nature of her offense, it is clear that her actions were not those of a well person.  Mrs. Mulloy has been evaluated on multiple occasions by a clinical psychologist and, while there are elements of her behavior and presentation consistent with various diagnosable mental health conditions, the evaluations do not indicate any pathology sufficient to cause Mrs. Mulloy to lose touch with reality, to be unaware of her actions, or to lack the ability to tell right from wrong.

### iii.     A Family Crisis, a Change of Heart

Mrs. Mulloy donated approximately half of the items to the Boys & Girls Clubs of America in February and March 2017 after being moved during a Lenten prayer group to let go of things that were negatively impacting her life.  The clothing was a symbol of her anger and resentment for the way she was treated by Bierly-Drake and was a constant reminder of the shame she felt because of her actions.  Through the purging of the stolen items, Mrs. Mulloy hoped to reconnect with a faith she had been too ashamed to embrace.

**Enhancements for Vulnerable Victim and Substantial Financial Hardship Should Not Apply**

The government seeks two-point enhancements for both vulnerable victim and extreme financial hardship, neither of which should apply in the instant scenario.

**a.  Vulnerable Victim**

A case warrants enhancement under U.S.S.G. §3A1.1(b), when:  a) a victim has impaired capacity to detect the crime, and b) the defendant knows or should know of this unusual vulnerability.  See e.g., *United States v. O'Brien*, 870 F3d. 11(1st Cir. 2017) (Enhancement upheld where investment adviser that had many clients yet chose only to defraud clients who were elderly, financially unsophisticated, had weak support networks, or were ill.)

The government cites the owner of the company Chris Drake's ("**Drake**") "devastation" over the death of his husband and business partner, Lee Bierly ("**Bierly**") in 2011 as grounds that he was unusually vulnerable to Mrs. Mulloy's crimes.  Yet Mrs. Mulloy's crimes, and the opportunity to commit them, did not begin until more than a year after Drake's partner's death.

Drake's mental state more than a year after Bierly's death did not leave him particularly vulnerable to Mrs. Mulloy's crimes.  At the time of Mrs. Mulloy's crimes, Drake was not an unsophisticated person with no support network, but rather the same domineering force at the business he had co-managed for decades.

Mrs. Mulloy acknowledges that she abused a position of trust and maintains that she was able to continue in her scheme unimpeded in part because of her critical role in the ongoing tax evasion which Drake directed.  The facts do not support the notion that Mrs. Mulloy obtained the position of trust because of Drake's grief, but instead came about because she had worked as a comptroller of the business for many years and was in the best position to execute certain tasks in

Bierly's absence.  Drake asked that Mrs. Mulloy return to a full-time position at the firm several times over the course of the year after Bierly's death as she had been in a part-time position since the economic downturn in 2008.  Only in or about April 2012 did Mrs. Mulloy accept Drake's proposal.

Drake was an active participant in Bierly-Drake and a savvy business person for decades before Mrs. Mulloy's arrival.  He was involved in its finances and intimately aware of the role Mrs. Mulloy played in engineering the company's finances.

**b. Substantial Financial Hardship**

The government seeks a two-point enhancement for substantial hardship suffered by Drake, the victim.  The PSR indicates that Drake placed more than $1.2 million dollars of his retirement assets into the business to cover the cost of its operations, and that doing so delayed his retirement.

In November 2015, the Commission revised §2B1.1(b)(2) to include an enhancement for substantial financial hardship to the victim.  While few cases have challenged or tested the limits of this enhancement, the Commission provided a list of circumstances which could serve as a basis for such an enhancement.

The 2015 amendment added the following language to describe substantial financial hardship:

> (F) Substantial Financial Hardship.—In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim— (i) becoming insolvent; (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code); (iii) suffering substantial loss of a retirement, education, or other savings or investment fund;(iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living

arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or her ability to obtain credit.[5]

While Drake placed certain assets into the business at different times, both before and after Mrs. Mulloy's misappropriation of funds, Drake also improperly used the business to shelter his lavish lifestyle from view of the government. Mrs. Mulloy assisted Drake in infusing the company with his personal funds on several occasions during her tenure. She believed that Drake's 2015 and 2016 infusions from his personal accounts to the company totaled approximately $700,000 and was aware at that time that Drake had well over ten million dollars in his retirement accounts. Moreover, Drake discussed his retirement plans with Mrs. Mulloy and others, expressing his desire to work through the end of 2018. As confirmation of this desire, Drake executed a three-year lease for the Bierly-Drake offices in or about the end of 2015, prior to Mrs. Mulloy's departure from the company. There is no indication that Drake was unable to retire or had to materially change his life based upon any infusion he provided as a result of Mrs. Mulloy's misdeeds.

In addition, Drake requested that Mrs. Mulloy arrange to have the loan reimbursed with a repayment schedule of $20,000 per month. The payments began in or about June 2016 and continued at least through December 2016, when Mrs. Mulloy left the firm.

## B. **Characteristics of Defendant**

### I.     **Personal/Family**

Debra Mulloy is the middle child of five siblings with two older brothers and two younger sisters. She went to Stoughton High School and, at age 23, attended Stonehill College. Mrs. Mulloy graduated from Stonehill in 1986 with a B.S. in Business.

Mrs. Mulloy started working in 1986 in accounting at a retail store, focusing on state tax implications of the company's retail sales. After working there for a few years, the manager for

---

[5] USSG App. C, Supp., amend. 792 (eff. Nov. 1, 2015).

whom Mrs. Mulloy worked left the company so Mrs. Mulloy moved on as well.  Mrs. Mulloy started working at an accounting firm, and met her future husband, Michael Mulloy ("**Michael**"), who was a customer of the company.  Michael owned a construction company and was a client of the accounting firm.  Mrs. Mulloy left the accounting company in 1991.

Mrs. Mulloy and Michael married in 1992.  For the next few years, they lived in apartments and with family.  Finally, in 1998, they were able to purchase a home in Milford, Massachusetts, the house in which they still reside.  Since 1999, Michael has suffered from atrial fibrillation, and Mrs. Mulloy has been a devoted caregiver and medical advocate.  As outlined in the attached letter from Michael's doctor, Dr. Akshay S. Desai, Michael has experienced various setbacks and episodes over the past 19 years.  **See Exhibit 1** (Letter from Dr. Akshay S. Desai, dated July 9, 2018).  Mrs. Mulloy has been present to help Michael in every case.  She will remain a vital caregiver and means of support for Michael for the rest of his life as he manages his chronic condition.  While Mrs. Mulloy understands that she has created the present situation, an extended period of incarceration will take Mrs. Mulloy away from this important duty and be a significant a hardship to Michael as he manages his medical issues in her absence.

Mrs. Mulloy and Michael have never had children, but Mrs. Mulloy has served as a frequent caregiver to her nephew's infant son (who experienced health difficulties shortly after birth) after the nephew had a falling out with Mrs. Mulloy's sister.  Mrs. Mulloy's nephew describes her as an important positive force in his life and notes that her support has been crucial to his ability to raise his son after the loss of his relationship with his mother.

11

As set forth in the letters of support attached as Exhibits, Mrs. Mulloy's family members and friends describe her as generous and committed, giving her time and energy to those she loves. **See Exhibit 2** (Character Reference Letters).[6]

Mrs. Mulloy acknowledges that she lost her moral compass and is well aware that she faces a substantial prison sentence. She will spend her period of incarceration and the rest of her life trying to make sense of her behavior which has caused harm to the victims, to Mrs. Mulloy, and to her husband and those who rely upon her.

## II.   History at Bierly-Drake

In October 2004, Mrs. Mulloy was hired as the comptroller at the interior design company Bierly-Drake Associates, Inc. In Mrs. Mulloy's role as comptroller of Bierly-Drake, she worked as a bookkeeper, maintaining the records of expenses and corporate finances, and managed the office. Throughout the first five years of employment, there was frequently conflict in the office. To appease employees after outbursts and verbal abuse, the owners of the company would offer employees gifts and perks. Mrs. Mulloy was a frequent recipient of the owners' inappropriate behavior, and their gifts and attention.

Over the course of time, Mrs. Mulloy wished to leave the company on several occasions but was always convinced to return by Bierly and Drake who came to her home in person and request she return. Mrs. Mulloy appreciated the attention and despite her complicated relationship with her employers, often accepted their overtures. The relationship with the owners crossed the bounds of normal employer-employee relationships in an unhealthy manner and weighed heavily on Mrs. Mulloy.

---

[6] Any letters provided as part of this exhibit that remain unsigned at the time of filing will be presented to the court in fully executed form at the Sentencing Hearing.

When Mrs. Mulloy raised concerns to an outside accountant about what she was doing for the company, he advised her to continue helping the owners avoid taxes because he believed she received better treatment than she would if she refused to help.

In 2009, following the economic downturn, Mrs. Mulloy's employment with the company was reduced from full to part time.  Mrs. Mulloy continued in her part-time role with the company until more than a year after Lee Bierly's passing, when in 2012, Drake implored her to return to work full-time, promising her more responsibility and a chance to take over many of Bierly's duties.

### C.  Mrs. Mulloy seeks a Sentence that is Sufficient to Satisfy the §3553 Factors

i.  **A Sentence should provide Just Punishment, Provide Adequate Deterrence, and Promote Respect for the Law**

Mrs. Mulloy is a first-time offender, and incarceration of any amount of time will have a jarring impact on Mrs. Mulloy and her family.  An excessive sentence will be a severe and life-altering punishment.  Incarceration in the case of a first-time offender sends an unmistakable message to society about the seriousness of this offense.  Mrs. Mulloy poses no risk of re-offense, she is not a career criminal, and, aside from her actions in this instance, has lived as a productive and law-abiding citizen.  She came to grips with her behavior before she was the subject of legal action and began to address her issues through her faith.

ii.  **Mrs. Mulloy seeks a Sentence Consistent with Sentences from this Court for Similar Offenses**

18 U.S.C.§ 3553(a)(6) cautions the Court to avoid sentencing disparities for defendants convicted of similar crimes.  To avoid impermissible disparities and unjustified differences between courts and judges, the Court can look at sentences imposed upon Defendants who have been sentenced for similar offenses.  See generally, *United States v. Boscarino,* 437 F.3d. 634 (7th Cir. 2007).

Of particular concern here is the fact, raised above, that Mrs. Mulloy was required as part of her plea to accept an aggravated identity theft charge.  A review of recent, similar cases suggests that had Mrs. Mulloy been charged with the same conduct prior to May 20, 2017, she would not have been forced to accept an identity theft charge as part of a plea or the mandatory 24-month sentence that the statute carries. **See Exhibit 3** (Chart Listing Sentences of Similarly Situated Defendants).

### iii.    Restitution

§3553(a)(7) addresses the need for a sentence to provide restitution to victims.  Mrs. Mulloy is a capable woman who has consistently been employed, and who, but for present circumstances, could find and maintain gainful employment which could be used to make restitution.  A conviction of this sort, and a prison sentence of any length, will make reentry to the workforce difficult.  But a sustained period of incarceration will all but guarantee that Mrs. Mulloy will be unable to find or maintain employment that would make any progress against the large restitution figure.

**(intentionally left blank)**

**D.  <u>Conclusion</u>**

For the foregoing reasons Debra Mulloy respectfully requests that the Court sentence her

to 24-37 months incarceration.

Respectfully submitted,

Debra Mulloy, a/k/a Debra DePaul,
By her attorneys:

/s/ Thomas E. Dwyer, Jr.
Thomas E. Dwyer, Jr. (BBO No. 139660)
Jonathan C. Crafts (BBO No. 677887)
Dwyer LLC
10 Derne Street
Boston, Massachusetts 02114
Tel:    (617) 227-6000
Fax:    (617) 723-6892
tdwyer@dwyer-llc.com
jcrafts@dwyer-llc.com

Dated: October 2, 2018

**CERTIFICATE OF SERVICE**

I, Thomas E. Dwyer, Jr., hereby certify that on this date, October 2, 2018, a copy of the foregoing document has been served via the Electronic Court Filing system on all registered participants, including Assistant United States Attorney Mark Balthazard.

/s/ Thomas E. Dwyer, Jr.

Dated: October 2, 2018

15