1                      UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,          )
                                        )
5    vs.                                )  Criminal Action
                                        )
6    DEBRA MULLOY,                      )  No. 18-10200-FDS
                         Defendant      )
7                                       )
                                        )
8                                       )

9

10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11
                              SENTENCING
12

13

14

             John Joseph Moakley United States Courthouse
15                        Courtroom No. 2
                         One Courthouse Way
16                       Boston, MA 02210

17
                         December 12, 2018
18                         3:00 p.m.

19

20

21

22

23                       Valerie A. O'Hara
                       Official Court Reporter
24     John Joseph Moakley United States Courthouse
                    1 Courthouse Way, Room 3204
25                       Boston, MA 02210
                   E-mail: vaohara@gmail.com

1    APPEARANCES:

2    <u>For The United States:</u>

3         United States Attorney's Office, by MARK J. BALTHAZARD,
     ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
4    Boston, Massachusetts  02110;

5    <u>For the Defendant:</u>

6         Dwyer LLC, by THOMAS E. DWYER, JR., ESQ., and JONATHAN C.
     CRAFTS, ESQ., 10 Derne Street, Boston, Massachusetts 02114.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2          THE CLERK:  All rise.  Thank you.  Please be seated.

3   Court is now in session in the matter of United States vs.

4   Debra Mulloy, Criminal Action Number 18-10200.

5          Would counsel please identify themselves for the

6   record.

7          MR. BALTHAZARD:  Good afternoon, your Honor,

8   Mark Balthazard on behalf of the United States.

9          THE COURT:  Good afternoon.

03:00PM 10          MR. DWYER:  Your Honor, Thomas Dwyer on behalf of the

11   defendant, Debra Mulloy, who is seated to my right.

12          THE COURT:  Good afternoon.

13          MR. CRAFTS:  Your Honor, Jonathan Crafts representing

14   the defendant, Debra Mulloy.

15          THE COURT:  Good afternoon.  This is the sentencing of

16   Debra Mulloy.  I've received and read the pre-sentence report

17   as revised through October 23rd, the plea agreement, the

18   defendant's sentencing memorandum, which had multiple

19   attachments, including letters from family members and

03:01PM 20   supporters, and the government's sentencing memorandum filed

21   November 1st.

22          Is there anything else I should have seen that I have

23   not?  Mr. Balthazard.

24          MR. BALTHAZARD:  No, your Honor.

25          THE COURT:  Mr. Dwyer.

1          MR. DWYER:  No, your Honor.

2          THE COURT:  Mr. Dwyer, I know you've had an

3    opportunity to review the pre-sentence report.  Have you gone

4    over it with the defendant?

5          MR. DWYER:  Yes, your Honor.

6          THE COURT:  Is that correct, Ms. Mulloy?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Mr. Balthazard, are there any victims who

9    wish to be participate in the proceeding?

03:01PM 10          MR. BALTHAZARD:  Yes, your Honor, I'm sorry, I meant

11   to ask when you listed the items that have been reviewed that

12   the victim impact statement was attached to the PSR.

13          THE COURT:  I'm actually not sure I saw it.  Do you

14   have a copy of it?  Does the victim wish to speak?

15          MR. BALTHAZARD:  The victim also wishes to speak.  The

16   victim impact statement had been submitted to the probation

17   office, and if the Court has not --

18          THE COURT:  Let me take a look at it because I don't

19   think I've seen it, and then what I will do is I'm going to go

03:02PM 20   through the objections and the PSR, the guideline calculation,

21   and then at that point before argument and elocution, we'll let

22   the victim speak.

23          MR. BALTHAZARD:  It's been redacted, your Honor, in

24   case it had been made public with the identification of the

25   victim to be redacted.

1          THE COURT:  All right.  I've read the victim impact

2     statement.  Let me turn next to the objections.  There were, I

3     think to the extent that there were objections in the

4     pre-sentence report, they've been addressed in one way or

5     another, either through amendment of the report or calling

6     certain facts to my attention.

7          In the defendant's memorandum, I think there are also

8     objections to certain guideline enhancements.  Do you want to

9     be heard on that, Mr. Dwyer, vulnerable victim and so forth?

03:05PM 10          MR. DWYER:  Well, I was, if this is the most

11     appropriate time.

12          THE COURT:  Yes.

13          MR. DWYER:  Just give me one minute, if you may.

14          THE COURT:  Yes.

15          MR. DWYER:  The government has proposed to the

16     probation department, and they have adopted the vulnerable

17     victim enhancement.

18          Now, I think if you look at the First Circuit cases,

19     primarily with respect to setting forth the affirmative

03:06PM 20     standard that must be met as well as the four or five cases

21     that were affirmed in the nature of those four or five cases

22     where people were elderly patients, there was age and physical

23     problems, I think that the standard -- and they were disabled,

24     somebody, an accountant was taking money away from somebody in

25     the 80's, I think if you look at the First Circuit cases, I

1    think it makes abundantly clear that those standards, those

2    cases, the language of the guidelines, the commentary section

3    with respect to the guidelines cannot in any way support the

4    proposition of vulnerable victim.

5         Vulnerable victim we look at two ways:  One, what was

6    the status of the person who was the victim when the fraud

7    began?  Now, if you look at the status and you take Mr. ████,

8    this is one of the most pronounced, decorated, awarded interior

9    designers in the entire country, and that was his role at that

03:07PM 10   time, and he has never changed that role.

11        He does projects here, New England, all over the

12   country, Florida, I think Colorado, all over the country, so if

13   you look, first of all, at Day One, the first day that my

14   client uses the credit card on Newbury Street to buy a

15   bracelet, on that Day One, the only relationship between her is

16   as an employee, and he is an owner.  He is not what they used

17   to call in other litigation a protected class, in my opinion.

18        He is not, in my judgment, falls within the standard

19   of the First Circuit, elderly, infirmed, et cetera, and so I've

03:08PM 20   briefed this longer than I should have briefed it in our memo,

21   but I think it captures the fact that his status, even if he

22   lost his partner a year before, his status is different.

23        My client wasn't dealing with credit cards until a

24   year after his partner died, and there's an allegation in here

25   that sets up the scenario that we're dealing with grief, and

1       the grief, for the 12 months of grief is somehow turned this

2       national interior design person into a vulnerable person for

3       which my client takes advantage.

4               THE COURT:   Okay.  Do you want to respond to that?

5               MR. BALTHAZARD:   I think the record is clear both in

6       the PSR and in Mr. ████'s victim impact statement that he was

7       not involved at all in the financial aspects of the business.

8       I don't dispute what Mr. Dwyer had to say about his -- the

9       other aspects of the business, the design aspects of it but

03:09PM 10      that he left all of the financial aspects of the business to

11      his then late husband, that when his husband died, one, he was

12      appropriately devastated and not paying attention to the

13      business, and that Ms. Mulloy took the opportunity to offer to

14      take on those financial parts of the business, which she did,

15      which put her in a position to be able to commit these crimes

16      and to steal, take more than two and a half million dollars

17      from the business.

18              Based on that, she knew that at the time that he was

19      vulnerable, vulnerability being no interest and no focus at all

03:10PM 20      on the financial end, and she knew about that, and she also

21      knew how he felt having just lost his husband, so she took

22      advantage of those factors to put herself in a position to

23      commit these crimes, and she did.

24              It would be entirely appropriate for the Court to

25      conclude that he was a vulnerable victim and that this

1    enhancement applies.

2            MR. DWYER:  Could I take ten seconds?

3            THE COURT:  Yes, Mr. Dwyer.

4            MR. DWYER:  There's not one case in the United States

5    of America that supports the proposition that was just

6    annunciated by Mr. Balthazard.

7            THE COURT:  All right.  You had another objection I

8    think as well to the guideline calculation, Mr. Dwyer,

9    financial hardship?

03:10PM 10           MR. DWYER:  Well, waive that.  I was going to say to

11   you at the outset, I meant to say we have waived financial

12   hardship, and the only other argument we have now or whatever

13   point you wish is on the value of the loss.  It is our position

14   that the guideline at 26 far exceeds the value of the loss, and

15   our view is that whether you look at post-*Booker* or you don't

16   look at post-*Booker*, that this sum of money is extraordinarily

17   high for a sentence of 63 months, of course, putting aside --

18           THE COURT:  I think I'll let you make that argument,

19   but I think that's not a guideline argument, in other words,

03:11PM 20   the loss I think is not disputed of $2.6 million, which fits

21   into this category.

22           MR. DWYER:  I have no objection to that.

23           THE COURT:  All right.  So let me rule on the one

24   objection then.  I think this could probably go either way, and

25   so as a matter of prudence, I'm not going to apply the

1    two-level enhancement for vulnerable victim.  I think there is

2    certainly a good argument that as a grieving person, an older

3    person, a person who the defendant knew was not involved with

4    or attentive to the financial aspects of the business would

5    qualify, but in order to avoid any appellate issue in that

6    regard, I'm not going to apply the enhancement, so I will

7    uphold that, and I think that takes care of the objections, if

8    I understand it.

9         So let me turn to the guideline calculation.  The base

03:12PM 10   offense level is 7, there's a 16-level enhancement for the loss

11   amount of $2.6 million, a two-level enhancement for a

12   substantial financial hardship and a two-level enhancement for

13   abuse of a position of private trust.  That brings us to a

14   level 27 with a three-level reduction for acceptance of

15   responsibility with the third level on government motion.

16        Mr. Balthazard, does the government so move?

17        MR. BALTHAZARD:  That's correct, your Honor, yes.

18        THE COURT:  All right.  That motion is granted, so

19   that gives us a level 24.  The criminal history category is O,

03:13PM 20   the criminal history category is I, and that produces, as I

21   understand the way this works under the statute, the guideline

22   range is 51 to 63 months, but Count 3, which is aggravated

23   identity theft, is two years on top of that; am I correct?

24        MR. DWYER:  Yes, your Honor.

25        PROBATION OFFICER:  Yes, your Honor.

1          THE COURT:  So that's the guideline range.  The

2     supervised release range is 1 to 3 years, although Count 3 has

3     a one-year maximum.  The fine range is $25,000 to a little more

4     than $10,600,000, the restitution amount is $2,654.346.95, and

5     there's a special assessment of $100 on each count for a total

6     of $300.

7          Is there any additional objection or correction to

8     that calculation not previously raised?  Yes.

9          PROBATION OFFICER:  Your Honor, the fine would be

03:14PM 10     20,000, not 25,000 with the change.

11          THE COURT:  20,000, thank you.

12          MR. DWYER:  I have no objection.

13          MR. BALTHAZARD:  No, your Honor, none.

14          THE COURT:  All right.  So that's the guideline

15     framework, and why don't we now have the victim elocution.

16     Mr. Balthazard.

17          VICTIM STATEMENT:  Judge Saylor, I know that you have

18     reviewed my victim impact statement and are certainly familiar

19     with the elements of the case, so what I would like to do today

03:15PM 20     is give you a little personal input into my life history and to

21     help you better understand why the devastation that this woman

22     caused me has been so effective.

23          At this point in my life, I've come to realize that a

24     lot of the lessons we learn as children really form the people

25     that we become.  And as an example of that, growing up in the

1   50's as a gay kid was tough.

2       My father discovered early on that I was more

3   interested in arts and crafts than baseball.  He decided to

4   turn his back on me and focus on my brother.

5       When his friends would make comments like, "There's

6   the neighborhood pansy," it was hard for him, and it was very

7   hard for me.

8       One positive element in this whole sort of dismal

9   period of my life was my mom.  My mom was always there.  She

03:16PM 10   always had my corner.  She always had my back.  I would come

11   home from school hopelessly blue after being bullied by the

12   other kids and she would comfort me.

13       She would turn to me and say, "You're terrific," and

14   that was the kind of enthusiasm that I needed to go forward and

15   go through it for another day.

16       The lesson I learned early in life is that while guys

17   often can be competitive, your best friend more typically will

18   be a woman.  Your biggest cheerleader, your biggest supporter.

19   I've lived that lesson all my life, and I've supported it and

03:17PM 20   believed in it, and, frankly, until now, it's been true.

21       When Lee died, we had been together for 32 years, I

22   was devastated, not so much because of the terrible, painful

23   death he experienced, but for the first time in my life, I

24   realized I really was alone.

25       When he was sick, he would often turn to me and say,

1    "When I die, I worry who will look out for you."  And I was

2    truly totally alone, no family, no one really to turn to.

3        Within weeks of Lee's death, Debbie approached me, and

4    she said, "You know, I could do a lot more for you, I could

5    help you work with the business."  This was a Godsend to me.

6        When Lee and I started our business, our arrangement

7    was that he would handle the business side of Bierly, Drake,

8    and I would work with clients in design, and it was a wonderful

9    relationship, but what it meant, I didn't know a lot about the

03:18PM 10   nuts and bolts and the mechanics of running a business, so when

11   Debbie made this offer, I was thrilled, I was overenjoyed, and

12   I felt huge gratitude.

13       It was at a time when Lee had died, and so I had to

14   contact my attorneys, again, a woman who I think is terrific,

15   and I said I have to do a will because Lee's died, and I sat

16   with Mary, and we talked about it, and I said, you know, I

17   think I would like to have Debbie be my executor, and maybe she

18   should be in charge of my living will.

19       And then this incredible sort of feeling of gratitude,

03:19PM 20   I made her sole beneficiary of my estate, which just seemed a

21   logical thing because here I was, again, with a woman who had

22   come into my life, and she was going to help me get through a

23   terrible time, and that's what she had volunteered to do.

24       I couldn't get over the personality change with Debbie

25   and Michael.  All of a sudden, they were warm and friendly,

1    invite me for dinner, they'd invite me on outings, and unlike

2    anything I had experienced, but it was a total personal change,

3    and I was ready to embrace it because it seemed like the

4    logical sort of step in my life, and I did.

5        Little did I know that this was the beginning of a

6    carefully devised scheme that would, had it continued, have

7    destroyed me totally and the business that I spent my entire

8    life to build.

9        This evil person recognized that she uncovered the

03:20PM 10   perfect victim, delighted to hand over the reins of my life,

11   and she could now exploit this for personal gain.

12       Almost immediately she started lobbying to replace our

13   accountant, Andy Hall, who was an old friend, had been one of

14   Lee's pallbearers and had helped us form our business.  She

15   said he had become lazy and complacent and really was too

16   expensive and we really should find someone else, so I

17   exceeded, and little did I realize this was probably, if there

18   was one profound, stupid thing you do in your life, this was it

19   because going forward, Debbie had no supervision, as she could

03:20PM 20   do whatever she wanted to do.  No one was checking the books,

21   no one was reviewing information, as we went monthly, as Andy

22   had done, and she had a total free reign.  She could wreak

23   havoc on a trusting sole.

24       She started on a small scale with minor charges that

25   really went unnoticed.  From there, her hunger grew, and in the

1    end amounted to millions that she squandered on frivolous

2    purchases to feed her expanding ego.

3              These funds would have given her aging boss, which is

4    me, a retirement.  It also would have helped her coworkers get

5    raises and bonuses, which they truly deserved, but this was her

6    opportunity to grab the brass ring.  She spent millions on

7    fashion and jewelry.  She became a philanthropist, the American

8    Heart Association, with money that she stole from the business.

9              She basically plundered Bierly, Drake and also at a

03:21PM 10   time that we may or may not remember was very tough on the

11   economy.  We were having a hard enough time as it was.  Her

12   hunger was insatiable.

13             When I found out one day that her only transportation

14   was a pickup truck, I thought, gee, you know, I am so grateful

15   to Debbie for what she's done for me, and wouldn't it be great

16   if she had a car if she wanted to go out to dinner with Michael

17   or go to a party, she could go in a car instead of a truck, so

18   I gifted her a car.

19             And true to form, from that point on, every single

03:22PM 20   expense incurred on that car was charged to the business.

21   These were big expenses, repairs, maintenance but also weekly

22   gas fill-ups were always accompanied by a trip to Dunkin'

23   Donuts.  I didn't realize you could spend that much money at

24   Dunkin' Donuts.

25             At this point, our statements were diverted from the

1    office, so even if I had had a sense of wanting to research

2    this, I couldn't have done it.  Also, she transferred money

3    from our bank, the Northmark Bank, to our line of credit to

4    cover her tracks, and I now personally stand to owe Northmark

5    Bank $300,000, which I am personally committed for because of

6    these efforts.

7         I find it interesting that in the two years since all

8    this horror has come to light, Debbie has never displayed the

9    slightest sense of remorse for her crimes, not to me, not to

03:23PM 10   the company, not to her coworkers.

11        Her offer of cooperation, I find amusing.  It was made

12   after her guilty plea, and, obviously, intended to make people

13   look upon her more favorably.

14        Her deposition was interesting.  It was a litany of

15   unfounded charges against coworkers somehow suggesting that

16   because her coworkers were stealing on a minor level, this

17   somehow exonerated her, and then we heard about the stores fed

18   her wine and cheese, and somehow that was their doing, and

19   that's why she went ahead and spent millions of dollars.

03:24PM 20        In conclusion, Judge Saylor, today I stand before you.

21   Tomorrow is my 74th birthday.  I work very hard to keep my

22   business going because it's all I know and because I will never

23   be able to be retire.  I offer think of Lee Bierly.

24        Lee was a larger than life personality.  He captivated

25   everyone he met.  When the cancer came, the pain, the

1    repetitive pain started to break his spirit.  In the end,

2    pancreatic cancer broke Lee.  In the end, Debra Mulloy broke

3    me.

4              THE COURT:  Thank you, Mr. ████.  All right.  With

5    that, let me hear first from the government as to its

6    recommendation.

7              Mr. Balthazard.

8              MR. BALTHAZARD:  Yes, your Honor.  Pursuant to the

9    plea agreement, the government recommends that Ms. Mulloy be

03:25PM 10  sentenced to a term of incarceration at the low end of the

11   range as calculated by the Court, which would be 51 months plus

12   the mandatory 24 months for the aggravated identity theft, in

13   addition that she be ordered after serving her sentence to

14   serve three years of supervised release, pay restitution of

15   $2,654,346.95.  The government in light of that does not

16   recommend any fine and that she be ordered to pay the $300

17   special assessment.

18              Clearly, this is a lengthy sentence that's being

19   recommended, but in the government's view, this is both

03:26PM 20  reasonable and necessary.  Starting with the seriousness of the

21   offense, as the Court has seen and heard, the amount of the

22   loss in this case was very substantial, more than two and a

23   half million dollars.  It was a crime committed over a long

24   period of time, a number of years, repeated acts of criminal

25   conduct, repeated acts of stealing these funds.  You've heard

1    the impact that this has had on the business, on Mr. ███, and

2    on their employees.

3         I anticipate, and we've heard Mr. Dwyer will be

4    arguing that the loss in some way overstates the seriousness of

5    the offense or Ms. Mulloy's culpability.  It appears to me that

6    the loss accurately reflects the seriousness of the offense and

7    the culpability.

8         This was a crime in which she controlled how much she

9    took.  She used the credit card, and she charged on it for

03:27PM 10   whatever she wanted to the extent that she thought she could

11   get away with, and that was entirely her decision.

12        The amount of the loss and what the guidelines reflect

13   is exactly appropriate as far as the seriousness and the

14   culpability.  I point out, again, if there's an argument with

15   respect to the guidelines and how that's -- whether the ranges

16   are appropriate or whether the loss tables are inappropriate

17   for some reason, that the guideline tables several years ago

18   were readjusted, and, in fact, had she committed this crime

19   several years earlier and been prosecuted, she would be in a

03:27PM 20   range where the loss tables, she'd actually be a couple of

21   levels higher than under the current guidelines that apply

22   today.

23        I think it's also clear from the record that she only

24   stopped because she thought she was going to be caught, and

25   that's why she quit the job.  There's no reason to think that

1   had she not thought that the jig was up and she had to leave

2   that she wouldn't have continued to do this, wouldn't have

3   continued to take money until the business ultimately had to go

4   out of business, until they went bust and Mr. ███ lost even

5   more money.

6        She did nothing to mitigate the crimes that she

7   committed.  When she thought she was going to be caught, she

8   quit, but she didn't only quit, she went into the business, she

9   took records, she took books, removed them, destroyed them,

03:28PM 10  which meant that the victim, Mr. ███, the company, they had

11  to hire forensic accountants to figure out what she had done,

12  how much she had taken, how she did it, tried to reconstruct

13  missing business records, and then when time went on, rather

14  than taking the items that she had purchased and perhaps

15  returning them or making them available so that they could be

16  sold and paid some kind of restitution, instead, she apparently

17  donated them, which meant that the victim in this case would

18  get nothing out of all of the items that she had bought using

19  his money.

03:29PM 20      She's paid no restitution.  You heard from Mr. ███.

21  She's done nothing in connection with the civil case other than

22  appear for a deposition and essentially point fingers at other

23  people as an excuse.

24      With respect to the aggravated identity theft,

25  Mr. Dwyer in his sentencing memo has said that or suggested

1    there's something inappropriate about the government bringing

2    this kind of charge.

3         I'd suggest that it's not really a close call in this

4    case.  She used another person's identification to carry out

5    the crime.  It served to help avoid detection.  By using

6    another card, it might have enabled her to point a finger at

7    the person whose named on the card, both to avoid detection and

8    make it more difficult to show that she was the one that

9    committed the crimes.

03:30PM 10        Ultimately, it didn't turn out that way, but by using

11    the card, using somebody else's identification, it had that

12    possibility, and it also could have impacted on the card

13    owner's credit had the bills not been paid.

14         She abused the trust.  We heard how much Mr. ████

15    trusted her, that he made her not only an executor but a

16    beneficiary, sole beneficiary of his will.  Mr. Dwyer argues in

17    his memorandum that her actions appear to defy logic but not

18    really.

19         I think it is unusual in this case that she didn't

03:31PM 20    seem to take the money and use it to line her pockets or to put

21    it in bank accounts, but clearly she had a purpose, which

22    appears to have been solely primarily to hurt Mr. ████ for

23    reasons that are not at all clear.

24         It's stated in the memorandum that she perceived that

25    he had been abusive to her, to other employees, that there were

1     slights against her, and I use the word "perceive" because

2     there is no evidence that, in fact, that's the case, and I note

3     in the PSR similar claims with respect to later jobs that she

4     had.

5         In particular, I'm looking at paragraph 65 through 69

6     of the PSR, so after she left Mr. Drake's employ, she went to

7     work for another company, quit it, she claimed, because the

8     owner was verbally abusive, then she went to another firm,

9     where it's reflected that poor attendance, and abandoned her

03:32PM 10    employment without any notice, and wouldn't consider rehiring

11    her, and she worked for a cleaning company, quit because she

12    disliked cleaning, worked for another company, was "weird."

13        So I'd suggest that the only slights were apparently

14    in Ms. Mulloy's head.  Objectively, this all rings untrue, as

15    the Court has heard.  She worked there for many, many years.

16    She was well paid.  She had a good salary.  She received

17    bonuses.  She got increased responsibility.  She went to

18    Mr. ███ and said I'd like to help you out and work more on

19    the finances, and he gave her that responsibility, both because

03:33PM 20    he needed the help but because he trusted her.

21        And, again, she became the beneficiary of the will,

22    the healthcare proxy.  There's no reason objectively to look at

23    this and to say that she was slighted or that she had been

24    abused, and, in any event, had she been, the answer is walk

25    away from the job, quit, go find something else.

1          That wasn't what she chose to do.  Instead, she chose

2    to impose severe financial harm on Mr. ███ and his company,

3    and she got away with it because of the incredible trust he had

4    in her.

5          When she said to him that they were having problems

6    with their accounts, with cash flow and needed more money, he

7    gave it to her, and he believed her reasons that customers were

8    not paying fully, they weren't coming through with what they

9    owed in a timely manner.

03:34PM 10         Instead of hiring an accountant to check the books and

11    figure out what's going on here, he didn't because he trusted

12    her, and for what, so that she could spend money, millions of

13    dollars buying high end goods at boutiques, clothing and

14    accessories, so much that she didn't even use all of it.

15         She appeared to just want to make herself out to be a

16    big shot at these boutiques where she was treated like royalty

17    because she was coming in there spending like she was the

18    queen.

19         And as Mr. ███ pointed out, she's expressed no

03:35PM 20    remorse.  There's no sense of remorse in the PSR, there's no

21    sense of remorse in the sentencing memorandum.  It just

22    attacked Mr. ███ really, went on and on about all the awful

23    things he had done to her and how she had been mistreated.

24         Now, I know Mr. Dwyer will say that he wrote the memo

25    and it's all him, but the attitudes that come through in the

1    sentencing memorandum are clearly based on what the defendant

2    told him and what her views were.

3          There's nothing about her personal history or

4    characteristics that suggest any more lenient sentence in this

5    case.  Any modest good works she performed are far outweighed

6    by the crimes she committed, not suggesting there's a need for

7    specific deterrence in this case, there's clearly a need in

8    addition to the other factors, a need for general deterrence.

9          Employees steal from their employers far too often.

03:36PM 10  The amount here is exceptional.  A significant sentence is also

11   needed in order to send a message of deterrence to others, and

12   those are the reasons for the government's recommendation, your

13   Honor.

14         THE COURT:  All right.  Mr. Dwyer.

15         MR. DWYER:  First of all, your Honor, I want to

16   apologize for asking the Court to continue from the last

17   hearing because I was ill-disposed.

18         I'm going to kind of go off my prepared script and

19   address a couple things right away.  First of all, while there

03:36PM 20  are inferences or more than inferences in our sentencing

21   memorandum about the toxic atmosphere at that firm, I want to

22   make abundantly clear at this point that there's no

23   relationship between that and the misconduct by my client.

24         This is not a but for situation where but for that

25   chaos, she would not have stolen the money.  This is not a

1    situation where, although it is perceived in the papers, I

2    think primarily because of the levity of the government's

3    position, this is not a case where she stole the money because

4    she hated ███████████.

5         This is in my judgment based upon my 38 years in the

6    game, it is in my judgment where a woman went to a shop on

7    Newbury Street, saw the big time purchases, realized she could

8    do it herself, she went back to two stores and did it, and she

9    took the product, put it into bags into her house until after

03:37PM 10   she left the firm.

11         I have sought to figure out what the pathology is

12   behind all of that, and I have been unable to figure it out.  I

13   think it's clearly some type of personality disorder, but in

14   essence it is she stole the money, so it had to be greed or

15   essence that she stole the money.

16         Now, to go to Mr. ██████'s point, you know, to get

17   respect for it, to go to Mr. ██████'s point, there is no

18   question that she violated the trust, and she is being

19   penalized for that in the sentence calculation, but there's

03:38PM 20   also no question that she was recently sued by Mr. ██████, a

21   highly competent lawyer, who's one of the amata of lawyers that

22   are in the back here representing Mr. ██████, and she was sued,

23   and she was asked to come in and talk to counsel, and she went

24   in for four or five hours and talked to counsel and expressed

25   her sorrow for not doing it and explained in detail how it came

1    about.

2         She did not at any point during that dialogue, and

3    half of it was a transcript, she did not in any way, manner, or

4    form blame anyone else but herself, but what she did do was

5    because the plaintiff lawyer knew she had no money, she's in a

6    negative net worth, they weren't interested in her, what they

7    were interested is this, they were interested in the two stores

8    that she went to because they felt that in both of those

9    stores, the owners and salespeople facilitated the fraudulent

03:39PM 10    use of the credit card.

11         Now, as it turns out, that's what happened, and it

12    turns out that's what she said at the interview, that's what

13    she said in the two-hour transcript, and that's what she said

14    in the four- or five-hour deposition last Friday.

15         Now, you can't reconcile, you cannot reconcile the

16    fact that 100 percent of the factor is she wants to hurt the

17    firm and the fact that she's helping the firm.  Without her

18    assistance, your Honor, ████████████ will collect nothing on

19    this lawsuit, which was why I urged you, although there is not

03:40PM 20    an abundant of law on this point, as I've discovered, urged you

21    that when you are considering the cooperation component here,

22    which you are entitled to consider under 1553, I think it is,

23    even if there's no 5K1, that because you have a restitution

24    element in your upcoming order that that assistance to ████████

25    lawyers will go against the restitution order, as we can

1    imagine.

2            I'm sorry, I never get it right, 3553, that will go

3    against the restitution, so I'm saying even without this and

4    with this, there is a link between her cooperation.  This idea,

5    I mean, Mr. ████ listened to the deposition last Friday.

6            The idea that she blamed other people is ridiculous.

7    That never happened.  Her lawyer was asked, was there anyone

8    else that stole money there, and she says yeah, A, B, C, D

9    stole money, this is why they did, she never backed off of what

03:41PM 10    she stole.

11           So she admitted every 20 seconds that she had

12    committed the crime, and every 120 seconds, she offered to

13    cooperate.  Now, that is why I think that under the cooperation

14    issue that you're entitled to consider under -- let me see if I

15    can get it right this time -- 18 U.S.C., 3553, you're entitled

16    to consider that under the case law and under the practice.

17    You're not required to do anything, but you're entitled to

18    consider whether or not the level of cooperation.

19           Now, you're also entitled to consider under the case

03:42PM 20    law and this First Circuit particularly, you're also entitled

21    to consider that, what, two four-hour sessions between my

22    client and the U.S. Attorney's Office.

23           Now, during that my client talked about these two

24    stores and these people at these two stores, but I fully

25    understand why, you know, the Department of Justice wasn't

1   going to take more time to chase down a couple of people in

2   stores, but she did, in fact, relay that information, and under

3   the First Circuit, I'm not talking about a large points for it,

4   but I do suggest that it's worth considering on the fact of the

5   cooperation.

6          She did instantly -- I talked to Mr. Balthazard before

7   the clothes were out of the house of the FBI raid and went in

8   to see him or called him right away.  She was in the office, I

9   think within a week, ten days making a proffer, and she was

03:43PM 10   back showing the FBI agents all the detail about all the

11   records.

12          And the idea that she scurried out of the firm with a

13   lot of the records, she had firm records, which we put into a

14   carton and returned to the civil lawyer that was on this case,

15   the first civil lawyer, which is different than the second

16   civil lawyer, so if I could just deal with those two topics

17   because I do think that we could debate about value of the

18   loss, but I think you've heard it 25 times or 125 times, but I

19   do think in this particular case, facing this guideline

03:43PM 20   calculation, you know, of offense level 24, this is 51 months,

21   and I realize it's $2.7 million, but 51 months is a, you know,

22   is a large number, okay, for something like this where, in many

23   ways, you can't even understand what happened here.

24          I mean, I believe there's no question she lost her

25   way, there's no question that moral compass, there's no

1   question that I agree with Mr. Balthazard that she got caught

2   up in all the stuff, but ask yourself if you've seen in your

3   whole legal experience a fraud case where a woman takes

4   $2.7 million of clothes and puts it in green bags and puts it

5   in her house and does not sell it until she leaves.

6   Quite frankly, I have been unable -- I've been in this

7   case I don't how long, I've been unable to figure out the

8   answer to that.

9   If I could have one minute, your Honor, because I'm

03:44PM 10   cutting, you'll be happy to hear.

11   Her character and involvement in the community and the

12   friends, you've read the letters.

13   And, of course, she cooperated with probation as well,

14   she cooperated with the mental health examiner from probation

15   as well.  I've discussed the civil suit.

16   I think you already know from the probation report her

17   basic character, and, you know, you have the letters in the

18   back that show how generous and caregiving that she is, and

19   it's hard to explain.

03:45PM 20   When she left Bierly-Drake, one of the things she was

21   starting to do in February and March is look online for these

22   online prayer groups.  I've never heard of them, but apparently

23   they exist, online prayer groups, and during these online

24   prayer groups at the time of lent, there was some consensus on

25   the online groups that you should give up during lent by giving

1    things away, and that is the point where she started taking

2    these clothes and going away.

3         It was basically 100 percent of the clothes she took,

4    she gave away 50 percent, 25 percent went to consignment shops,

5    a lot of which came back to the FBI, and the FBI, I think,

6    picked up about 25 percent at the house.

7         Now, I agree with Mr. Balthazard, I really do, I agree

8    with Mr. Balthazard that on the identity theft to me is just,

9    you know, we pled to it, okay, so it's not one of these

03:46PM 10    situations where we pled to it, however, it's not a crime,

11    that's not what was said.  We pled to it, period.

12         The only thing I wanted to raise, and maybe it's just

13    because it makes me happy to raise it, and that is that this

14    policy was not around since Sessions' memo in this office until

15    this case, I believe we were the first or the second.  There's

16    nothing Mr. Balthazard can do about it.  There's nothing he can

17    do about it at all, and someone some day may argue that the

18    conduct in this case doesn't really fall within the statute,

19    but, you know, we had to just get through the case, and that is

03:47PM 20    what we had to do.

21         So on the issue of -- just let me one second because

22    I've gone out of order, and I think that I've done cooperation,

23    so that ends that.  I hate to impose upon your Honor, but I'm

24    trying to shorten this thing down.

25         I'd like to ask you to consider the loss of the value

1    argument, which we just touched upon briefly again, and I know

2    that the, you know, you've heard other lawyers like me talk

3    about the fact of, you know, more than half of the cases since

4    2003 have gone below the guidelines on this issue, and I do

5    know you probably heard the American Bar Association has raised

6    issues with respect to this so-called shadow guidelines, which,

7    again, I think overstates, you know, the enhancement.

8         And so I think -- give me one second here.  I just

9    think on this cooperation thing, I think when there's an FBI

03:48PM  10   raid and you call up and say I want to bring my client in,

11   Mr. Assistant U.S. Attorney, and bring your client in, your

12   client admits the conduct and said, you know, this is how I did

13   it.

14        I mean, I don't think you have to bring in a little

15   index card with bold letters that say I'm sorry, you know, I

16   don't think you have to come in with an index card in red that

17   says I'm guilty, I mean, you come in and you just say, you

18   know, I did it, and I'm going to cooperate, and when you're

19   talking about this civil case, and I have great respect, as I

03:49PM  20   said, for Mr. █████.

21        But you talk about this, we sat there for eight hours

22   admitting what we did and trying to help him, and I suppose if

23   I knew that he was going to say this today, I would have

24   brought a big poster in the room and had her read the poster

25   that says I'm very, very sorry, that she does the five-hour

1     deposition.

2             So I think that basically, your Honor, I have little

3     to add.  As I said before, my client simply lost her way, in my

4     judgment, part of this, just the motive to me remains a

5     mystery.  The moral compass that guided her conduct up to 51

6     years of age was simply set aside; however, she now faces your

7     judgment with the hope that this presentation will set a

8     framework for your mercy.  Thank you.

9             THE COURT:  All right.  Thank you.

03:50PM 10            Mr. Balthazard, do you want to respond?

11            MR. BALTHAZARD:  Just with respect to the cooperation,

12    there was no -- nothing that amounts to substantial assistance,

13    and, in fact, my memory is that Mr. Dwyer and his partner came

14    in, spent some time with us, presented a number of areas where

15    she might provide assistance.  None of it was any interest, all

16    would have relied simply on Ms. Mulloy's say-so, which she had

17    no credibility, and nothing came of any of it.

18            I can't speak at all to what efforts were made with

19    respect to the civil case.  That was news to me until yesterday

03:51PM 20    or the day before that there had been a deposition, and, again,

21    my understanding is she was ordered, there was a Court Order

22    that she come in and be deposed, and that she -- whether it was

23    an order or a subpoena, but that she did come in.  She didn't

24    take The Fifth, she answered questions.  What may come of it, I

25    have no idea.  I think that's really it, your Honor.

1      THE COURT:  Okay.  Ms. Mulloy, do you wish to address

2   the Court before I impose sentence?

3      THE DEFENDANT:  No, I don't, I'm sorry.

4      THE COURT:  All right.  I'm not sure where to begin

5   except maybe to acknowledge what other people have said that

6   this is a somewhat bizarre crime.  I'm not sure I understand

7   what went on here or what its purpose was, but the crime was

8   submitted, nonetheless.

9      Whether it was agreed or revenge or something else,

03:52PM 10  she did commit the crime.  Whether other -- whether boutique

11   owners or other people in some way facilitated it is not really

12   before me.  The crime was committed, and it's not an impulsive

13   crime, by any stretch of the imagination.  It was a calculated

14   series of acts, repeated acts of theft over many years, in

15   violation of a position of private trust with a man, who

16   although she claims was abusive to her thought highly enough of

17   her to not only give her opportunities but to actually name her

18   as the beneficiary of his will.

19      The great majority of the people I sentence had

03:53PM 20  horrible background in some form or another, they were crack

21   babies, their mothers were prostitutes, their fathers abandoned

22   them, they grew up in poverty and violence in Central America

23   or the South Bronx or stories like that that are

24   heart-breaking.  That's not the situation here.  There's

25   nothing of that sort in the defendant's background.  In fact,

1   she appears to have grown up in a loving and supportive home.

2        She wasn't a drug addict.  A lot of crimes, of course,

3   are motivated by addiction, and we don't have that here.  I

4   don't know what the psychology of any of this is, but I don't

5   have a psychiatric report.  I'm not going to speculate that she

6   has one disorder or another.

7        As far as the evidence of her remorse, I have to say

8   I'm having trouble seeing it, even if she did agree to be

9   deposed in the civil litigation, which is good, it's a positive

03:54PM 10   factor, but, again, I don't see any expression of sorrow,

11   sadness, remorse, the kinds of things one would hope to see

12   under the circumstances.

13        I agree with the proposition that it looks like she

14   stopped because she was likely to get caught, and then she set

15   about destroying various books and records of the crime to make

16   matters worse.

17        As to a couple arguments that were made in terms of

18   whether loss is the right measure here, putting aside how it

19   impacts the guidelines, I think the loss is exactly the right

03:55PM 20   measure here.

21        Sometimes loss and gain don't aid up.  You could have

22   someone who steals $10,000 and destroys a $10 million company.

23   That's not what happened here, or sometimes you have stock

24   fluctuations or real estate valuations that go up and down or

25   whatever, and things somehow get out of whack, but she decided

1    exactly how much she stole, and that's the measure of her

2    crime, and, again, it wasn't an impulse, it wasn't just what

3    happened to be in the cash register or the safe that day, she

4    she knew what she was stealing when she stole it.

5         As to the aggravated identity theft, I'm not by any

6    means a fan of this statute, which, of course, ties my hands to

7    some extent.  I don't like mandatory sentencing statutes, and

8    this is a consecutive mandatory statute.

9         I would be delighted if it were repealed or delighted

03:56PM 10   if it weren't charged, but it is charged, she pleaded guilty,

11   and I have to live with what the statute says, and Congress

12   pretty clearly, for whatever reason, has concluded that it

13   needs to be a two-year mandatory consecutive sentence, and I've

14   been forced to impose it under circumstances that were much

15   more sympathetic than this.

16        So where does all that take me?  The government is

17   recommending a 75-month sentence, 51 months being the bottom of

18   the guidelines, as I've calculated them, plus 24 for the

19   mandatory two-year consecutive sentence.

03:57PM 20        What I'm going to do is this, and it's a little more

21   than an act of mercy.  I'm going to take some time off that.

22   I'm going to give her a sentence of 69 months, which is 45

23   months plus 24.  It's a significant sentence for someone of her

24   age with no criminal record.  It is more than five years in

25   prison, which I think is enough to make the point under the

1    circumstances.

2           I don't mean by doing that to suggest in any way that

3    she's not entirely deserving of that sentence, and she's

4    probably deserving of much more, but I think that's what the

5    appropriate sentence is under the circumstances.

6           I will, of course, impose a restitution order and a

7    three-year term of supervised release.  And, again, there was a

8    good argument that she deserves a longer sentence than that,

9    but that is the sentence that I will impose.

03:58PM 10          All right.  My practice, as you probably know, is to

11   state the sentence that I'm going to impose followed by a

12   formal statement of the reasons for the sentence if I haven't

13   done so already, after which I'll give counsel an opportunity

14   to make a final set of objections or corrections.

15          Mr. Dwyer, do you have any recommendations you'd like

16   me to make concerning the place of her incarceration or

17   anything of that sort?

18          MR. DWYER:  Danbury, please, FCI-Danbury and a

19   self-report date that's, I don't know, we can set a date here,

03:59PM 20   but whether or not we have to wait but a self-report date at

21   the end of January possibly.

22          THE COURT:  What is the government's view of

23   self-reporting?

24          MR. BALTHAZARD:  The government has no objection, your

25   Honor.

1          THE COURT:  All right.  Would the defendant please

2     stand.  Pursuant to the Sentencing Reform Act of 1984 and

3     having considered the sentencing factors set forth at

4     18 United States Code, Section 3553(a), it is the judgment of

5     the Court that the defendant, Debra Mulloy, is hereby committed

6     to the custody of the Bureau of Prisons to be imprisoned for a

7     term of 69 months.

8          The Court makes a judicial recommendation that she

9     serve her term of incarceration at FCI-Danbury or at another

04:00PM 10     suitable facility as close as possible to Massachusetts.

11          The prison term consists of terms of 45 months on

12     Counts 1 and 2 to be served concurrently and a term of 24

13     months on Count 3 to be served consecutively to the terms

14     imposed on the other counts.

15          Upon release from imprisonment, the defendant shall be

16     placed on supervised release for a term of three years.  This

17     term consists of terms of three years on Counts 1 and 2 and one

18     year on Count 3, such terms to run concurrently.

19          Within 72 hours of release from custody of the Bureau

04:00PM 20     of Prisons, the defendant shall report in person to the

21     district to which she is released.

22          It is further ordered as a condition of supervised

23     release that she make restitution in the amount $2,654,346.95

24     to Bierly-Drake Associates, Inc., care of their counsel,

25     William Sinnott.

1          Payment of the restitution shall begin immediately

2   according to a Court-ordered repayment schedule.  I'm sorry,

3   payment of the restitution shall begin immediately according to

4   the requirements of the Federal Bureau of Prisons' inmate

5   financial responsibility program while incarcerated and

6   according to a Court-ordered repayment schedule during the term

7   of supervised release.

8          All restitution payments shall made to the clerk,

9   U.S. District Court for transfer to the identified victim.  The

04:01PM 10   defendant shall notify the United States Attorney for this

11   district within 30 days of any change of mailing or residence

12   address that occurs while any portion of the restitution

13   remains unpaid.

14          Is there a live forfeiture issue, Mr. Balthazard?

15          MR. BALTHAZARD:  There is not, your Honor.

16          THE COURT:  All right.  While on supervised release,

17   the defendant shall comply with the following terms and

18   conditions:

19          She must not commit another federal, state or local

04:01PM 20   crime.

21          She must not unlawfully possess a controlled

22   substance.

23          I'm going to suspend drug testing conditions based on

24   my determination that she poses a low risk of future substance

25   abuse.

1          She must cooperate in the collection of DNA as

2     directed by probation.

3          She shall comply with the standard conditions that

4     have been adopted by the Court, which are set forth at

5     Section 5D1.3C of the Sentencing Guidelines, and which will be

6     set forth in detail in the judgment.

7          She's prohibited from engaging in an occupation,

8     business or profession in the financial field that would

9     require or enable her to have access to other people's

04:02PM 10     financial information.

11          She must participate in a mental health treatment

12     program as directed by probation.

13          She must pay the balance of any restitution imposed

14     according to a Court-ordered repayment schedule.

15          She's prohibited from incurring new credit charges or

16     opening additional lines of credit without approval of

17     probation while any financial obligations remain outstanding.

18          You must provide the probation office access to any

19     requested financial information, which may be shared with the

04:02PM 20     financial litigation unit of the U.S. Attorney's Office, and

21     she'll be required to contribute to the costs of evaluation,

22     treatment, programming, and/or monitoring based on the ability

23     to pay or availability of third-party payment, and it is

24     further ordered that the defendant shall pay to the

25     United States a special assessment of $300, which shall be due

1   immediately.

2       All right.  You may be seated.  In terms of the formal

3   reasons for the sentence, it's a nonguideline sentence imposed

4   under Section 3553(a) for the reasons indicated.

5       The terms of supervised releases I think are

6   appropriate to ensure adequate supervision and to ascertain the

7   defendant's ability to make restitution payments.

8       I'm imposing no fine because to the extent the

9   defendant has any financial assets, they should go to the

04:03PM 10   victim and not to the Federal Government, and the special

11   assessment is, of course, mandatory.

12       Do counsel have any addition or correction or

13   objection to that sentence not previously stated?

14       MR. DWYER:  No, your Honor.

15       MR. BALTHAZARD:  No, your Honor.

16       THE COURT:  All right.  The sentence is imposed as

17   stated.  I will order that she self-surrender at the

18   institution designated by the Bureau of Prisons six weeks from

19   today, and I believe there was a waiver of appeal; am I right?

04:04PM 20       MR. BALTHAZARD:  Yes, your Honor.

21       THE COURT:  All right.  Ms. Mulloy, I understand from

22   the plea agreement that you've waived your right to appeal your

23   conviction and sentence; nonetheless, I'm going to advise you

24   of your right to appeal.  I don't mean to confuse you.  I'm

25   doing it as a precaution in case for some reason your waiver of

1   rights does not apply or is not effective, and you'll have to

2   consult with your counsel to see whether or not that is true.

3          If you have not waived it, you may be able to appeal

4   your conviction if you believe that your guilty plea was

5   unlawful or involuntary, or if there was some other fundamental

6   defect in the proceeding that you have not waived.

7          You may have the right to appeal your sentence under

8   some circumstances, particularly if you think the sentence was

9   contrary to law.

10          If you're unable to pay the costs of appeal, you may

11   ask permission to have those costs waived and appeal without

12   pain.  You must file any notice of appeal within 14 days after

13   the entry of judgment, and if you request, the clerk will

14   immediately prepare and file a notice of appeal on your behalf.

15          And, again, I understand that you have waived your

16   right to appeal.

17          MR. DWYER:  That's correct, your Honor.

18          THE COURT:  All right.  Is there anything further,

19   Mr. Balthazard?

04:05PM 20          MR. BALTHAZARD:  No, your Honor.

21          THE COURT:  Mr. Dwyer.

22          MR. DWYER:  No, your Honor.

23          THE COURT:  All right.  Before we break, Mr. ████, I

24   want to indicate that my heart certainly goes out to you, and I

25   wish you well in your recovery to the extent that you can

1  recover from this set of events.  All right.  Thank you.

2          THE CLERK:  All rise.

3          (Whereupon, the hearing was adjourned at 4:05 p.m.)

4

5                    C E R T I F I C A T E

6  UNITED STATES DISTRICT COURT )

7  DISTRICT OF MASSACHUSETTS ) ss.

8  CITY OF BOSTON )

9

10         I do hereby certify that the foregoing transcript,

11 Pages 1 through 40 inclusive, was recorded by me

12 stenographically at the time and place aforesaid in Criminal

13 Action No. 18-10200-FDS, UNITED STATES of AMERICA vs.

14 DEBRA MULL0Y and thereafter by me reduced to typewriting and is

15 a true and accurate record of the proceedings.

16         Dated this October 7, 2019.

17

18                    s/s Valerie A. O'Hara

19                    _____

20                    VALERIE A. O'HARA

21                    OFFICIAL COURT REPORTER

22

23

24

25